[Crim. No. 12803. Third Dist. Apr. 20, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS ALLEN SPAIN, Defendant and Appellant.

COUNSEL

John W. Amos II, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, James T. McNally and Carla J. Caruso, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CARR, J.—A jury found the defendant guilty of murder in the second degree, and further found he personally used a firearm in the commission of that offense. (Pen. Code, §§ 187, 189, 12022.5.) Defendant, who was 17 years of age at both the time of the offense and at trial, was sentenced

to the California Youth Authority for the prescribed term.[1] On appeal, he makes the following contentions: (1) statements and evidence which were the product of an illegal arrest were erroneously admitted; (2) the trial court erroneously denied his motion for a mistrial based on misconduct by a spectator; and (3) his right to cross-examine witnesses was improperly restricted. We shall affirm.

As defendant does not challenge the sufficiency of the evidence supporting his conviction, a brief summary of the relevant facts suffices. On the evening of November 20, 1981, a bottle was thrown through the front window of defendant's house by a group of youths. Defendant took a .22 caliber rifle outside and fired several shots after the youths, apparently intending to scare them off. About five minutes later, defendant again emerged from the house with the rifle. He saw a different group of youths and yelled a racial epithet, asking whether they had returned. The group ran upon seeing defendant with the gun, and defendant again fired several shots after them. This time, however, one of the bullets struck a youth in the head, killing him. About an hour after police arrived, a neighbor identified defendant as the perpetrator and he was arrested in his home.

## DISCUSSION

### I

■ Defendant contends a tape-recorded statement he made to police should have been excluded as the product of an illegal arrest. He urges he was arrested in his home without a warrant in violation of *People v. Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]. We disagree.[2]

■ *Ramey* established the rule "that warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances." (16 Cal.3d at p. 276.) "In this context, 'exigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or

---

[1]Although the record does not so indicate, we assume the defendant was properly certified to stand trial as an adult pursuant to Welfare and Institutions Code section 707, subdivisions (b) and (c).

[2]The instant offense was committed on November 20, 1981. Accordingly, the provisions of article I, section 28, subdivision (d) of the California Constitution are not applicable to this proceeding. (*People v. Smith* (1983) 34 Cal.3d 251, 263 [193 Cal.Rptr. 692, 667 P.2d 149].) Any reliance by the trial court on the "Truth-in-Evidence" provision in denying defendant's suppression motion was harmless, however, in light of the trial court's express finding that its ruling would be the same even under the law as it existed prior to the enactment of article I, section 28, subdivision (d). We therefore consider whether the defendant's statements were properly admitted into evidence under the law as it existed at the time of the offense. (*Ibid.*)

serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*Ibid.*)

When police officers first arrived at the scene, there were no lights or any signs of activity at defendant's house. There was no response to a knock on defendant's door. The witnesses in the area were uniformly evasive and no one appeared to know what had happened. The investigating officer, McHale, arrived at 11:25 p.m. About an hour later, he was approached by defendant's neighbor, who said defendant had done the shooting. McHale proceeded to defendant's front yard, and found a knife there. At that point, defendant's mother emerged onto the porch of the house. She asked what the officer was doing and he responded by asking where defendant was. The mother replied, "Dennis is inside asleep, but he didn't do it, I did." The mother turned to walk back inside the house. McHale requested she stop; she did not. Accompanied by two other officers, McHale followed the retreating woman into the house. Once inside, the mother picked up a rifle and stated "this is the rifle that was used." The officer wrestled the gun from her; another officer went into defendant's bedroom and took him into custody.

Defendant apparently concedes exigent circumstances existed to allow the officers to enter the house and arrest his mother. The concession is warranted as, based on the facts of the homicide and the mother's confession, the police had probable cause to arrest her, without a warrant, on the porch. She could not thwart this otherwise lawful arrest by retreating into the house. (*United States* v. *Santana* (1976) 427 U.S. 38, 42-43 [49 L.Ed.2d 300, 305, 96 S.Ct. 2406].) The officers properly followed her in "hot pursuit," even if the pursuit was brief. (*Ibid.*) The seizure of the weapon from defendant's mother was also reasonable as she had just confessed to shooting someone with that very rifle and the officer had no assurance she would not turn it on him. Exigent circumstances clearly existed for the entry into the home and the seizure of the rifle.

Defendant asserts, however, that once the officers had seized the weapon and arrested his mother, no further exigent circumstances existed to justify the entry into his bedroom and his arrest. Defendant's position is completely untenable. He would require that the police leave the house to get a warrant *after* they had alerted all the occupants to their presence, taken one weapon from defendant's mother and discovered that the alleged perpetrator was still inside the premises. Contrary to defendant's assertion, they did *not* know they had the murder weapon. They were not required to accept the

mother's statement at face value, particularly as she had just contradicted a bystander's version as to the perpetrator of the shooting. Under the circumstances, it was a reasonable supposition that defendant was still at large in the house, armed with a weapon, and willing to use it on the police just as he had on the youth in the street.

The hot pursuit and the imminent danger to the officers distinguish this case from both *People* v. *Ramey, supra,* and *James* v. *Superior Court* (1978) 87 Cal.App.3d 985 [151 Cal.Rptr. 270], upon which defendant relies. In both those cases, the warrantless entry occurred well after the offense; after the alleged perpetrator had left the scene; after the criminal had been identified from a police investigation and photographic lineup (*James*) or by a private investigation (*Ramey*); the entry in both cases was in a location different than where the offense occurred; and neither offense involved the use of a firearm. (*People* v. *Ramey, supra,* 16 Cal.3d at pp. 267-268; *James* v. *Superior Court, supra,* at pp. 988-989.) *Ramey* relied on the fact the defendant in that case "was arrested for the offense of receiving stolen property, *a nonviolent crime evidencing no propensity for endangering life.*" (16 Cal.3d at p. 276, italics added.) The officers in this case had been told there was a sound of breaking glass; that defendant ran into the street and fired five shots at three people running down the street. At that point, defendant's propensity to use the weapon made him a walking exigent circumstance. The officers were justified in making the warrantless arrest of defendant in his home.

Nor has defendant demonstrated how or in what way he was prejudiced by the admission of his tape-recorded statement. Defendant stipulated at trial that the recording need not be transcribed and he has not requested the tape be transmitted to this court. (Cal. Rules of Court, rule 10(d).) This court did request transmission of the exhibit. (Cal. Rules of Court, rule 10(d).) Our review of the tape discloses a brief conversation which is not inconsistent with the defense presented.[3] The officer asked defendant on the tape if he had seen any of the youths with a weapon; there is no audible response. At trial, the officer testified defendant indicated he had not seen a weapon. Defendant's trial testimony was that he *thought* the victim had a gun, though he did not actually see one.[4] The defense theory of imperfect

---

[3]There are only two discernable variances between the taped conversation and defendant's testimony at trial. On the tape defendant said there was only one shooting incident and not two. Defendant also told the officer he had never shot the rifle before, which he retracted at trial. On the tape, however, defendant states he was so scared he was in a "daze," and he reiterated this fear at trial, including being so scared he didn't know what he was saying to the officer. In any event, the noted variances do not contradict the main thrust of his defense.

[4]A pellet gun was found near the victim's body. The evidence indicated, however, that the pellet gun belonged to defendant's brother, who placed the weapon near the victim after the shooting had occurred.

self-defense was not discredited by the tape recording. We perceive no prejudice to defendant by the admission of the tape recording.

## II

Defendant next contends the trial court erred in denying his motion for a mistrial based on the misconduct of a spectator. Witnesses had been excluded from the trial. A juror informed the trial judge that a woman had been seen telling prospective witnesses in the hallway the questions being asked of witnesses in the trial. The trial judge called the woman into chambers and discussed the incident with her. The discussion disclosed the woman to be a "court watcher" who had been under involuntary psychiatric care. She recalled accusing one witness of lying after he had testified. She also spoke to another witness "but he said he didn't know anything . . . [a]nd our conversation was kind of short." Further, she spoke to a third witness, although she couldn't remember who, when or what was said. The defense then moved for a mistrial on the basis that this woman might have influenced the testimony "in some manner."

■ We agree "that misconduct on the part of a spectator constitutes ground for a mistrial if the misconduct is of such character as to prejudice the defendant or influence the verdict. The trial court, however, has a large measure of discretion in determining whether the conduct of a spectator is of such nature as to produce prejudice. A motion for a mistrial may properly be refused where the court is satisfied that no injustice has resulted or will result from the events of which the complaint ensues." (*People* v. *Slocum* (1975) 52 Cal.App.3d 867, 884 [125 Cal.Rptr. 442].)

The trial court specifically found that "if anyone were coordinating the testimony he or she has failed completely, . . ." This finding is supported by the record. Numerous details of the incident varied from witness to witness, evidencing that this woman did not produce even the "modicum of evidentiary coordination" asserted by defendant. Moreover, there is no showing that she influenced any witness. She spoke to one *after* he testified, to another only briefly, and couldn't remember what she said to the third. No prejudice to defendant from the woman's activities appears in the record. The trial court was within its discretion in denying the mistrial motion.

## III

■ Finally, defendant urges the trial court improperly restricted his cross-examination of a prosecution witness, thereby denying his rights of confrontation and due process. The restriction occurred when the trial court

sustained the prosecution's objection to the defendant's use of leading questions while cross-examining defendant's mother. Defendant concedes there is a reported opinion directly on point which upholds the restriction imposed by the trial court. (*People* v. *Grey* (1972) 23 Cal.App.3d 456 [100 Cal.Rptr. 245].) He invites this court to reject *Grey*'s reasoning, however, and reach a contrary conclusion. We have examined *Grey,* and find it persuasive. We shall therefore decline defendant's invitation.

The controversy in the present case arose when the prosecution called defendant's mother as a witness. She admitted lying to the officers at the scene in an effort to protect her son. She did not remember, however, whether defendant told her he acted in self-defense, or whether he told her it had been an accident. When the defense objected to the prosecutor's use of leading questions on direct examination, the trial court overruled the objection and found the mother was a hostile witness. During cross-examination the defense embarked on a series of leading questions, culminating in the mother's agreeing that defendant told her the shooting had been an accident. The prosecution objected and the trial court made the challenged ruling.

In *People* v. *Grey, supra,* 23 Cal.App.3d 456, a similar situation obtained. The defendant had been charged with theft and receiving stolen goods. (At p. 459.) The prosecution called the defendant's fiancee as a witness. Her testimony was confused and contradictory and her demeanor indicated she was inclined to favor the defense as much as possible. (At p. 464.) For those reasons, the trial court ordered defense counsel to refrain from using leading questions in cross-examining the fiancee. (*Ibid.*) This ruling was upheld as a proper exercise of the trial court's discretion, the court citing the official comment to Evidence Code section 767. (*Ibid.*) *Grey* is directly on point with the present case. The prosecution's witness was closely related to the defendant, with a logical reason to try to protect the defendant. In fact, the trial court in this case expressed its sympathy for the mother's plight: "her mother's instinctive . . . and almost irresistible impulse to protect her child certainly is in conflict with her sworn statement that she would tell the truth . . . ."

Evidence Code section 767 provides: "Except under special circumstances where the interests of justice otherwise require: [¶] (a) A leading question may not be asked of a witness on direct or redirect examination. [¶] (b) A leading question may be asked of a witness on cross-examination or recross-examination." The danger in allowing "a question that suggests to the witness the answer that the examining party desires" (Evid. Code,

§ 764) is to the truth-seeking function of the trial. Allowing the examiner to put answers in the witness' mouth raises the possibility of collusion (see 3 Wigmore, Evidence (Chadbourn rev.ed. 1970) § 769, p. 155), as well as the possibility that the witness will acquiesce in a false suggestion. (1 Jefferson, Cal. Evidence Benchbook 2d (Cont.Ed.Bar 1982) § 27.8, p. 762.) This danger is substantially reduced, however, when it is an adverse witness under cross-examination. "The purpose of the cross-examination is to sift his testimony and weaken its force, in short, to discredit the direct testimony. Thus, not only the presumable bias of the witness for the opponent's cause, but also his sense of reluctance to become the instrument of his own discrediting, deprive him of any inclination to accept the cross-examiner's suggestions unless the truth forces him to." (3 Wigmore, *op. cit. supra,* § 773, p. 165.)

■ Evidence Code section 767 was derived from former Code of Civil Procedure section 2046, enacted in 1872. The rule is thus long established that permitting the use of leading questions on direct examination when the prosecution is faced with a hostile witness is a special circumstance. (*People* v. *Goldenson* (1888) 76 Cal. 328, 349 [19 P. 161]; *People* v. *Bliss* (1919) 41 Cal.App. 65, 71 [182 P. 63].) Because assessment of the circumstances revealing the witness' hostility is uniquely within the realm of the trial court, the use of leading questions on direct examination is committed to the sound discretion of the trial court. (*People* v. *Maxey* (1972) 28 Cal.App.3d 190, 197 [104 Cal.Rptr. 466]; *People* v. *Polak* (1958) 165 Cal.App.2d 226, 232 [331 P.2d 662].)

■ The situation in *Grey* and in this case is the converse of the rule just set out. If the prosecution is permitted to ask a hostile witness leading questions on direct, should the defendant be foreclosed such questions on cross-examination? The answer may not be the same in all cases, as the witness may be hostile to the prosecution for a reason other than favoritism to the defense. Accordingly, the decision to foreclose such questions must again be vested in the trial court's discretion. The problem, of course, is that a limitation on the use of leading questions affects the defendant's ability to confront and cross-examine the witness. The technique of leading is often the defendant's most valuable weapon in his or her effort to discredit the prosecution's case. While agreeing with defendant that a restriction on leading questions is important, we disagree that it is a matter of constitutional dimension. The defendant's confrontation right permits him cross-examination (*Pointer* v. *Texas* (1965) 380 U.S. 400, 407 [13 L.Ed.2d 923, 928 85 S.Ct. 1065]]), but the *form* such cross-examination takes is a matter within the trial court's discretion. (*Glasser* v. *United States* (1941) 315 U.S.

60, 83 [86 L.Ed. 680, 706, 62 S.Ct. 457]; *People* v. *Bannon* (1922) 59 Cal.App. 50, 59 [209 P. 1029].) As long as the defendant is fairly permitted to confront and cross-examine the witnesses against him, his constitutional rights are unimpaired. The defendant has erroneously attempted to equate his statutory right to use leading questions (Evid. Code, § 767) with his constitutional right of confrontation (U.S. Const., Amend. VI; Cal. Const., art. I, § 15).[5] The two are not necessarily coextensive. Defendant concedes as much when he recognizes that he "was *not denied the opportunity to cross-examine* Mrs. Spain; rather his cross-examination was restricted in the sense that Defense Counsel was not permitted to ask leading questions." (Our italics.) This restriction was a matter within the discretion of the trial court. Accordingly, the question for this court is whether there was an abuse of that discretion.

■ As expressed by Justice Jefferson, the rationale behind the restriction in Evidence Code section 767 is that "[w]hen the danger [of false suggestion] is present, leading questions should be prohibited; when it is absent, leading questions should be allowed." (1 Jefferson, *op. cit. supra,* § 27.8, p. 762.) The legislative committee comment to Evidence Code section 767 expresses the same rationale in a manner directly applicable to this case: "The court may also forbid the asking of leading questions . . . where the witness is biased in favor of the cross-examiner and would be unduly susceptible to the influence of questions that suggested the desired answer." (See legis. committee com., Deerings Ann. Evid. Code, § 767 (1966 ed.) p. 38; citing 3 Wigmore, *supra,* § 773.) *Grey* relied on this legislative comment in upholding the trial court's order in that case. (*People* v. *Grey, supra,* 23 Cal.App.3d at p. 464.) We also find it persuasive. Moreover, we are persuaded by numerous federal cases permitting similar restrictions. (*United States* v. *Tsui* (9th Cir. 1981) 646 F.2d 365, 368; *United States* v. *Bensinger Company* (8th Cir. 1970) 430 F.2d 584, 591-592; *Mitchell* v. *United States* (9th Cir. 1954) 213 F.2d 951, 956.) ■ In defendant's mother the trial court was faced with a witness who had demonstrated her obvious and natural bias in favor of defendant. We find no abuse of discretion in the decision to restrict the defendant's use of leading questions.

---

[5]We disagree with defendant's assertion that Evidence Code section 767 must be read in conjunction with Evidence Code section 776. Section 767 permits leading questions on cross-examination "[e]xcept under special circumstances where the interests of justice otherwise require: . . ." Section 776 permits a party to a *civil* action to call an adverse party or a person identified with an adverse party and examine that person as if under cross-examination. It is inapposite to the pending criminal case. Similarly inappropriate is defendant's citation to *Ransom* v. *Superior Court* (1968) 262 Cal.App.2d 271 [68 Cal.Rptr. 507]. That case involved the question of whether a contempt had been adequately proven where a party had refused to answer questions when called as an adverse witness under Evidence Code section 776. (At pp. 275-276.) It has no application here.

The judgment is affirmed.

Regan, Acting P. J., and Sims, J., concurred.